Case Number 21-1727 Hay v. New York Media Mr. Weiss, whenever you're ready. Thank you, Your Honor. Good morning. Good morning, Mr. Court. My name is Jillian Weiss, and I represent Appellant Professor Bruce Hay. I'm reserving one minute for a quote. And the relief requested is to reverse the district court's order denying the amendment of the First Amendment complaint and dismissing it to this moment, and to demand it for re-evaluation in accordance with this court's suspections. There's two issues here. First is whether an agreement to meet professional standards of investigative journalism is indefinite, and we would say it is not under the Greenberg case, the second department, where it said professional journalism principles are well known and courts have frequently applied them. And in paragraph 75 of the second, the post-second amendment complaint, promises are set out in great detail. Part of this is whether a contract with a journalist necessarily contravenes the First Amendment, and it does not, as shown by the Supreme Court in Cohen. The text of the First Amendment says nothing about journalists making private contracts. In fact, banning contracts more clearly goes against the text of the amendment. Now, the second issue is whether the course of intentional sexual harassment weekly over a year emanating from New York City is recluded by Hoffman. It is not, because Hoffman involved a single discrete action. Whereas, or rather, Hoffman does not require living in New York City. Only that living affects New York City. It's a suggestion that living in New York City is required as a victim. So to go more in depth with the contract issue. Well, what's the impact in New York City here for your client? Well, there's an impact in New York City, not necessarily on the client, but I would note that in the Chow case, which was decided by the Eastern District, in that case they alleged a course of conduct of sexual harassment, and she did not work in New York City. But even so, the court said that it created an impact in New York City. So the course of systematic, sustained sexual harassment emanating from New York City creates an impact in New York City. This was designed to protect workers in New York City, the statute, correct? That's correct, Your Honor. Well, but you want us to stretch that to cover somebody who's working in Boston or in Massachusetts. That is correct, just as in the Chow case, it covered somebody in California. The question is, where are these effects occurring? It's assumed that it's only going to occur, create an effect in New York City if the person is working in New York City. And there's, you know, a great temptation to say that's the only possible effect. But, in fact, in, for example, the Robles case, which was decided by the Eastern District, there they said that the defendant must allege that there was discrimination within the boundaries of New York City from this hostile work environment that was alleged. And the court specifically said to determine the location of the discrimination under the New York City Human Rights Law, the courts looked at the location of the impact of the offensive conduct. And it specifically said the pattern of unspecified discriminatory acts that do not identify any particular acts occurring in New York City are insufficient to state a claim under the New York City Human Rights Law. And, of course, the implication is that had they set forth, as we did in this case in the proposed amendment to the claim, a specific and sustained and systematic series of phone calls emanating from New York City that were—constituted structural harassment, that they very well might have granted that under the law. And we'll note that that's a post-trial case. Now, the issue of living in New York City, it is mentioned in the law, but it's dictated. And the question is, is that what the holding of Hoffman was? It is not. The holding of Hoffman is specifically— I guess I'm still struggling with why there's an impact in New York City here. Everything was done up in Boston. I'm sorry. Everything was done in Massachusetts that I can see that affected the—in terms of the impact on your client. Well, I'm suggesting that there was an impact from a person creating a systematic course of sexual harassment over a long period of time. I'm not quarreling with that aspect of it, but it's who's feeling the impact. You're just saying because there's an impact in the air, it's bad, they're doing it here, even though the actual impact may be felt elsewhere, it's still a basis for— That is correct. —the client. Just as in Chow, the impact was felt by the plaintiff living in California, but the court said that there was nonetheless an impact on New York City. Similarly, in this case, you're making the same argument as in Chow. And as far as the standards go, the indefiniteness of the contract, professional standards you say just by themselves can be enforced. There's no difference in professional standards between the various people who hold—who issue these standards. It's a uniform body of rules that is, in effect, incorporated by reference. Is that the argument you're making? Well, there is a fairly uniform body of rules, and you can set them out in this proposed second amendment complaint from the Society of Professional Journalists, from the Radio, Television, Digital News Association, from the Fourth Estate Public Benefit Corporation. These would be the subject of Esther's testimony at trial. The question here really is, can you ever have such a contract? And I think the answer has to be yes. Routinely, journalists make contracts. Well, did Bolenek say that she would follow those standards in an oral contract? Or what's your theory there? Yes. That is what is alleged in paragraph 75 of the second amendment complaint. It sets out a fairly exclusive set of promises that is bind to what you will make. And the question is whether promises of this type are able to be enforced. And obviously, there's going to be some situations where you have a very vague, you know, well, will you make it professional. Obviously, that represents some issues. But in this case, it's different because of the explicitness of the promise. Why isn't the contract barred in any event by the statute of frauds? which by its very terms is incapable of being performed within a year, which is the promise of the plaintiff that he would not give interviews or give his material to any organization other than the defendant. That contract would last forever. Well, in this case, it was incapable of being performed within a year because it had an end date that could occur within a year. In other words, the plaintiff was under a duty under the contract that he alleged to never give his material to anyone other than New York Magazine. Well, I don't think that's exactly what was the promise. I think it was not to give it to them before. You didn't allege that. That's not alleged. It's not alleged that it's an exclusive story? Yes, exclusive. It's alleged that it's exclusive. That doesn't, that doesn't, that doesn't. You just said what, what was alleged was that he wouldn't give it to other people before he gave it to New York Magazine or before they published it. But I don't think that's alleged. I think it's alleged to be exclusive, which means that he can never give his material to any other press source. Am I wrong about that? Well, it says in paragraph 76 that he agreed to cease communications with the Times and other media outlets about the story and to work exclusively with Baughman and New York Magazine. So once they publish the story, you know, the promises were at an end. And under the General Motivation Clause… Where does it say once he, where does it say once the, once the story was published the promises were at an end? Because the promise specifically is to cease communications and to work exclusively with them. Yeah. So is that violated if he resumes communications and works with others? After the story was published, I don't think it would violate that promise. Well, it's convenient for you to say that, but where does it say it in the complaint? Well, if the issue is whether or not the promise was specific to the timeframe, the issue, the question is going to be, is the promise possibly enforced within a year? Because that's what the General Obligations Law requires under the Zuberini case. So it says if they absolutely have no possibility, in fact, of lawful performance within one year. So here where it says that he's going to cease communications and to work exclusively, that was in exchange for the publication of the article. So once the article was published, the contract has been executed. So you're just saying… You can't make an argument. You can't make a promise. No, the part about his not having communications with the Times and dealing exclusively with New York Magazine has not yet been accomplished. It will never be accomplished until he dies. No, because it was in exchange for a promise to create the publication. Once the publication was created, the contract was executed. So you say, if I make a contract with somebody and says, I promise never to tell the New York Times about this, to cease any communications with the New York Times and not tell them, in exchange for which you're going to give me $1,000. You say, as soon as I get the $1,000, everything is forgotten, and now I'm free to tell the Times? That seems like a pretty silly argument. Well, I mean, that's why in contracts we see specific provisions that say this survives the execution of this contract. The reason for those statements in contracts is because it is not clear that when the $1,000 is paid, that the person now is bound forever and ever to never say anything. This particular promise doesn't say he's never going to say anything, that he's never going to work with them. It says he's going to work with them exclusively. He did that in the published article, End of Story. It's not that he couldn't say anything to anyone else after that period. He certainly has, and he has the right to continue to speak on this subject. So I just went back to refresh my memory on paragraph 75 of the second amended complaint that you mentioned earlier. Yes. Which is the one spot in the complaint that talks about professional standards. Yes. And the language is that in the phone conversation, she made the following promises to the plaintiff in exchange for his promise to work exclusively with her in New York Magazine. One, that the investigation and reporting of the story by her and the magazine would be professional. In that she would bring to bear her experience, her long experience of her editors and colleagues at New York Magazine, investigative reporting to ensure that the story was up to the customary ethical standards of long-form investigative journalism. That's the sentence that you're relying on. Is that correct? Well, that's one of the promises. Well, there's also another one that's going to be thorough, and that it's going to be sensitive to the delicate gender issues raised by the story. But I'm just going to your paragraph. She's going to be a professional. Well, it's not saying simply, well, you're going to be a professional. It's laying out, at least actually track the requirements of the standards that are set out in the codes that I mentioned before, Society of Professional Journalists and so on. So the question is going to be, you know, did she live up to that? That is a question for those who, you know, have set forth the standards. So we would contend that that is a sufficiently definite promise based on the standards that were set out specifically in the second piece of the plan. Thank you, counsel. You've reserved a minute for rebuttal. Thank you very much. We'll hear from the athlete. Thank you. Thank you. Thank you. May I please record, my name is Katherine Bolger. I'm Davis-originated on behalf of the Federal Chapel of the Hellies. Bruce Hay, a Harvard Law professor, recalled the two articles that issued in this litigation to be published. He pleaded in his complaint that he reached out to Karen Bolland, provided hours of interviews to her from his home in Massachusetts, introduced her to witnesses in Massachusetts, and provided hundreds of pages of documents to her. He pleads he fact-checked the article. He pleads he attended pitch meetings for books and television deals after the article was published. He even pleads he agreed to help Bolland defend against threatened defamation claims. He participated in and promoted the article for months, and nobody disagreed with that. But then Professor Hay changed his mind, not about the facts of the article. He still says the facts of the article are true, but how he described his experiences. But his belief in his change of mind and how he described his experiences isn't a cause of action. Aren't we really a step away from that and looking precisely at what they're arguing? Paragraph 75, is that actionable? Can that be actionable? A breach of contract case? Well, I think the breach of contract thing has essentially three elements, right? So the first of that is the bigness of that promise. As a judge I can correctly tell, it is, quote, plainly too vague to be enforceable. Under New York law, that contract to be enforceable must be sufficiently definite and explicit such that the parties understood it, but also such that a judge can determine if it's been breached. And here, the claims are to be professional, to be thorough, to be sensitive, and to be treated with utmost professionalism. None of those claims are capable of being adjudged as explicit or definite. And in fact, this reference to the code of deciding a professional journalist from the other journalistic standards doesn't fix that problem. So first of all, all of the references to the codes in the plaintiff's complaint are actually to a Wikipedia page. The idea that there's this uniform body of codes out there, that's not here. It's certainly not referenced in the promise that Mr. Hayes says Ms. Ball made, right? He doesn't say, well, we're going to abide by the rules of the Society of Professional Journalists. So it explicitly disclaims that it is an enforceable code of conduct. It says that it cannot, nor can it ever be, under the First Amendment, legally enforceable. And Your Honors, that's correct. And that's the way – that's what is funneling this – sorry, that's the portion that Mr. Hayes fundamentally misunderstands about Greenberg. The Greenberg case is a Second Department case. It's a defamation case. And the judge is assessing whether the plaintiff has established gross irresponsibility. And it says that in assessing gross irresponsibility, you can look to professional journalist standards. But what it actually says is specifically that professional journalism standards wouldn't be enough for liability. It says, professional journalistic principles are well-known and courts have frequently applied these principles. But the rest of the sentence is, in conjunction with the constitutionally mandated standard, in order to establish the parameters of a coverable libel. In other words, the journalism standards aren't enough. You need something else to get to liability. So there is simply – But that's a libel case, right? That case is a libel case, right? Greenberg is a libel case. But it is the only case that the plaintiff has cited that references professional journalistic standards is meaningful at all. But this is a contract case. This is a different case. It is wrong, but it's the only evidence that the plaintiff has – the only case that the plaintiff has referenced. And I will say the Cohen v. Cowell case, which was also referenced in the opening, is actually – we all know that case. It's a promissory esophole case in the United States Supreme Court. The contract they issued there was a contract to keep a source's identity confidential, a clean, discernible, distinct contract. And in enforcing it, the court actually said, you know, if this has anything to do with the content of the speech, it could not be enforceable. That's a specific carve-out in Cohen. And here, there's no question that the alleged breach is related to the contents of the article. If you look at the Second Amendment complaint, paragraph 199 and paragraph 201, which are portions of the contract complaint, specifically state that what is wrong with this is that it is false, that the article is false, and it places the parties in a false light. So this contract would not be enforceable without being adjudged by the standards of the First Amendment, which would tip us into the box of definition. So your argument is that it couldn't legally have been binding and also that it wasn't actually, as a matter of fact, what they agreed to in the contract? My argument is that it could not have been legally binding, that there's no agreement articulated because you can't have an agreement to be sensitive. You can't enforce an agreement to be sensitive, which is the agreement. And if there were such an agreement to not publish unprofessional speech, that would violate the First Amendment. And there is no body of law that allows liability for First Amendment speech that is unprofessional, as you are pointing to me. What about the statute of frauds issue and the promise to, on his part, to be exclusive with New York Magazine and not talk to the Times? So I think there are actually two statute of frauds problems. I think there is a significant statute of frauds problem with an endless promise to be exclusive. And the purpose of the statute of frauds is specifically to cut off the wishy-washy back-and-forth of Weber, whether this could be a promise. All right, so he claims in answer to my questions, he claims this was not an endless promise. He claims that it's clear that his promise to be exclusive was cut off as soon as the article was published. Not only do I not see that as a complaint, Your Honor, but because it's an imaginary promise, there's no evidence outside of the complaint that it's not a promise either. There's also another promise, which would be outside of the statute of frauds, which is there is a promise to behave towards a plaintiff with utmost professionalism. That's in paragraph 75. That's not time-worn either. So there are actually two promises that I think lie with the statute of frauds. I did want to just quickly address the New York City Human Rights Law. The Hoffman case, which I know Ms. Weiss suggested was a late step, is very clear. I wouldn't ignore this if I were to run a court. It says, it is clear from the statute's language that its protections are afforded only to those who inhabit or are persons in the city of New York. That's what the Hoffman case actually said. And the Chiu case, well, that job was in New York. The person was actually in California at the time that the job was in New York, as was the job that issued enrollments. So to me, it's very clear that the New York City Human Rights Law applies only to people in New York City. And Mr. Hay, please know that I trust New York City. Other than that, Your Honor, I think the decision below is right and should be affirmed. I'm happy to answer any other questions. Thank you, counsel. Thank you. We'll hear rebuttal. Thank you, Your Honors. I would mention first that although Reaper was a libel case, the point of this is not whether it controls the case or not, but that it points out that there are specific journalistic principles that are well-known and that courts have frequently applied them. In that case, they said, you don't need experts. You don't need professional journalistic principles because this is a libel case. It's a reasonable person standard. But they acknowledge that those do exist, and they are enforced by courts. They noted that investigative journalism is high-risk journalism. They noted that hit-and-run journalism is no more protected under the First Amendment than speeding on a crowded sidewalk is permitted under a valid driver's license. This would be very easy to address for future issues if New York media or other media defendants did not want to incur contract liability. They have a click-through agreement for all of their subscription subscribers. Why not for a source or for other people they're working with that say they waive any contractual liability? And in any event, a written release for the use of name or likeness is required by civil rights law in Sections 50 and 51. This is not a defamation case. That's why he didn't raise the issue immediately. He learned about it after the fact, and he raised it when he learned about it. So we're not addressing defamation here. We're addressing was this properly researched and written. Thank you. Thank you both.